1           IN THE UNITED STATES DISTRICT COURT

2               FOR THE DISTRICT OF ALASKA

3

4  STATE OF ALASKA,

5            Plaintiff,

6      vs.

7  UNITED STATES OF AMERICA; CHICKEN
   VENTURES, LLC., an Alaska limited
8  liability company; GEORGE W.
   SEUFFERT, SR.; GEORGE W. SEUFFERT, JR.,

9

            Defendants.
10 _____

11 Case No. 3:12-CV-00114-SLG

12

13

14              DEPOSITION OF DR. ROBERT MUSSETTER

15                  Taken April 23, 2015
                 Commencing at 9:00 a.m.
16
                Volume I - Pages 1 - 228, inclusive
17

18
                 Taken by the Plaintiff
19                        at
                 OFFICE OF THE ATTORNEY GENERAL
20                1031 W. 4th Avenue, Ste 200
                   Anchorage, Alaska 99501
21

22

23  Reported by: Susan J. Warnick, RPR

24

25

1  A P P E A R A N C E S

2  For Plaintiff:

3          OFFICE OF THE ATTORNEY GENERAL
           BY: Michael Schechter
4              Jessie Alloway
           1031 W. 4th Avenue, Ste 200
5          Anchorage, Alaska 99501
           (907) 269-5232
6          jessie.alloway@alaska.gov
           michael.schechter@alaska.gov
7
   For Defendant:
8
           Office of the U.S. Attorney
9          BY:  Rachel K. Roberts
           76000 Sand Point Way NE
10         Seattle, WA  98115
           rachel.roberts@usdoj.gov
11         dean.dunsore@usfdoj.gov

12
   Present:   Kevin Sorensen, SOA, Dpt. of Natural Resources
13            Jonathan Fuller
              Don Whitaker
14
   Taken by:  Susan J. Warnick, RPR
15

16  BE IT KNOWN that the aforementioned deposition was taken

17  at the time and place duly noted on the title page, before

18  Susan J. Warnick, Registered Professional Reporter and

19  Notary Public within and for the State of Alaska

20

21

22

23

24

25              P R O C E E D I N G S

1            DR. ROBERT MUSSETTER,

2 called as a witness herein, being first duly sworn to

3 state the truth, the whole truth and nothing but the truth

4 by the Notary, testified under oath as follows:

5                    EXAMINATION

6 BY MR. SCHECHTER:

7 Q    Good morning, sir.  My name is Mike Schechter.  I'm

8 an assistant attorney general with the Alaska Department

9 of Law.  We're here today in the matter of State of Alaska

10 v. United States, pertaining to the navigability of the

11 Mosquito Fork.

12          Would you please state your full name and spell

13 your last name, please?

14 A    All right.  It's Robert Allen Mussetter,

15 M-u-s-s-e-t-t-e-r.

16 Q    And would you please provide a business address?

17 A    It's 3810 Automation Way, Suite 100, Fort Collins,

18 Colorado 80525.

19          MR. SCHECHTER:  And counsel, would you please

20 make your appearance.

21          MS. ROBERTS:  Rachel Roberts for the United

22 States.  Last name is spelled R-o-b-e-r-t-s.

23          MR. SCHECHTER:  And with the State of Alaska we

24 have Jessie Alloway, assistant attorney general with the

25 Department of Law; Kevin Sorensen from the Department of

1    Natural Resources; Jon Fuller; and Doug Whitaker, who are

2    our -- two of our experts in this case.

3    BY MR. SCHECHTER:

4    Q    Dr. Mussetter, have you ever had your deposition

5    taken before?

6    A    Yes, I have.

7    Q    How many times?

8    A    I don't know the exact number.  A dozen or so.

9    Q    Okay.  So would it be fair to say that you're

10   familiar with the process?

11   A    I believe I am.

12   Q    And so you understand that today you've been sworn,

13   you're under oath, and your testimony today is -- has the

14   same effect as if it were given in a court of law?

15   A    That's correct.

16   Q    And we have a court reporter here today.  And you

17   understand that she can only record audible answers.

18            Do you understand that?

19   A    I do understand that.

20   Q    Okay.

21   A    I may forget sometimes; you'll remind me, I'm sure.

22   Q    I will do my best to promptly remind you.

23            Okay.  And do you understand that we are looking

24   for full and complete answers to the questions that I ask

25   today?

1  A    I do understand.

2  Q    So my responsibility today is ask questions that you

3  can understand.  I would ask that you help me in my

4  responsibility:  If you don't understand a question of

5  mine, that you say so and let me know, and I can either

6  rephrase the question or re-ask it in a way -- or maybe

7  provide additional information.

8         Would that be acceptable to you?

9  A    Yes.

10  Q    So I will try to take breaks on occasion so that

11  everybody is comfortable, for whatever needs folks might

12  have.  And a half hour for lunch.  Would that be okay?

13  A    Sure.

14  Q    I would ask that, if -- and you can ask for a break

15  whenever you feel you might need one.  I would ask that,

16  if there's a question pending at the break, that you

17  answer the question before we go on the break.

18         Will that be acceptable?

19  A    Sure.

20  Q    And then, if during the course of the day -- and, you

21  know, this is true in life -- sometimes we remember

22  additional information or we want to clarify something

23  that we said earlier.  If that happens and you feel that

24  additional information is important to an earlier answer

25  that you gave or that you have some reason to believe that

1  an answer you gave earlier was not completely accurate

2  or -- and you want to correct it or add additional

3  information, will you let me know?

4  A    Sure.

5  Q    Did you bring any documents or materials with you

6  today?

7  A    I did not.

8  Q    Are you taking any medication, drugs, or alcohol that

9  would make it difficult for you to understand or answer my

10  questions today?

11  A    No.

12  Q    Do you have any condition that would impair your

13  ability to listen to or respond to my questions?

14  A    No.

15  Q    Is there any reason that you would not be able to

16  answer my questions fully and accurately today?

17  A    No.

18  Q    What qualifications do you hold that are relevant to

19  your opinions in this case?

20  A    Well, that's an open question.

21        Well, I have a bachelor's degree in civil

22  engineering, and in that -- in those studies I've

23  concentrated on hydrology and hydraulics.  And then I have

24  a master of science and Ph.D. in hydraulic engineering.

25  So -- and I've spent 30 -- roughly 35 years studying

1    using the boats that have been defined for me as in

2    customary use at the time of statehood.

3    Q    So when you say "navigable" in that last sentence, do

4    you really mean boatable for those boats?

5    A    Yes, I think that's probably a better term.

6    Q    Are you prepared to render all of your opinions in

7    this case today?

8    A    I believe so.

9    Q    Have you done all the required work to reach the

10   opinion or opinions you have in this case?

11   A    I believe so.

12   Q    Is there any work that hasn't been done that is

13   necessary to render your opinion?

14   A    Not to my knowledge.

15   Q    Is there any work that you wanted to do but were

16   unable to do before rendering your opinion?

17   A    Yes.

18   Q    What was that?

19   A    Well, as you saw from my report, I wanted to float

20   the river on a couple different occasions and was unable

21   to do that.

22   Q    Is there any other work that you wanted to do, but

23   were unable to do?

24   A    Not that I can think of.

25   Q    How does the inability to complete the work of

1  floating the river affect your opinions?

2  A    I don't think it directly affects my opinions.  I

3  think I have enough information to render the opinions

4  that I'm giving in this case.  But it certainly would give

5  me a higher level of comfort if I had seen the river at

6  different flow levels from what I did see.

7  Q    What does "higher comfort level" mean?

8  A    It means that, when you talk about something that you

9  haven't directly seen, there's always a little nagging

10  uncertainty because you haven't seen it.  And when you

11  actually see something, it's much more -- it's much easier

12  to directly be completely confident of what you're saying.

13  Q    Have you asked for any information from counsel or

14  anyone else affiliated with the defendant that has not

15  been provided to you?

16  A    Not to my knowledge.

17  Q    Can you please state the opinions that you're

18  prepared to give in this case?

19  A    My opinion is that the segments of the river that I

20  spelled out in my -- specifically spelled out in my expert

21  report, and I -- just from memory I don't remember the

22  exact river miles, but I'm sure you have that -- are not

23  boatable.

24            And based on the definitions of the craft that

25  would have been viable for commercial purposes or

1    customary use at the time, it's also my opinion that those

2    segments of the river would not be navigable.

3    Q    Are there subsidiary opinions that you need to render

4    to support that opinion?

5    A    Nothing that I can think of.  I mean, there are

6    certainly a multitude of things that went into building

7    that opinion, that I'm sure we'll talk about.  But I can't

8    think of any significant thing that would be worth

9    discussing at this time.

10   Q    Okay.  Why don't we get your report out.

11              (Exhibit 1 was marked.)

12   BY MR. SCHECHTER:

13   Q    And, Dr. Mussetter, you've been handed what's been

14   marked as Exhibit 1 for the purposes of this deposition.

15              Can you identify Exhibit 1?

16   A    Yes.  This is Expert Report of Dr. Robert A.

17   Mussetter, Navigability of Mosquito fork River, Alaska

18   versus United States.  And there's a civil action number

19   that we probably don't need to read.

20   Q    Okay.  And is this a report that you prepared?

21   A    It is.

22   Q    Okay.  And do you believe this to be a full and

23   complete copy of the report that you prepared?

24   A    I haven't looked thoroughly through the exhibit that

25   you just handed me, but on the surface it appears to be.

1  Q    Okay.  Will you let me know if anything jumps at you

2  as being incomplete?

3  A    I will.

4  Q    And something I forgot to -- I neglected to mention

5  earlier.  If a document -- if you think of a document that

6  may help your answer or may refresh your recollection

7  about something, will you let me know what that is and

8  we'll see if we can get that for you?

9  A    Sure.

10  Q    So on pages 1 and 2 of Exhibit 1, is this a complete

11  list of the opinions that you will render in this case?

12  A    I believe it is, yes.

13  Q    And you state that the Mosquito Fork, from river mile

14  3.3 to river mile 36.3 is not navigable; is that correct?

15  A    That's correct.

16  Q    And you also state that river mile 55 through mile 60

17  is not navigable; is that correct?

18  A    That's correct.

19  Q    So with regard to the other reaches in the Mosquito

20  Fork, between mile zero, its confluence, and river mile

21  80.5 at Wolf Creek, are there other segments of the river

22  that you've reviewed and are prepared to issue an opinion

23  on?

24  A    The reach below Chicken, I did not specifically study

25  that reach because it's my understanding that that's

1  already been determined to be navigable for whatever

2  reason.  And so I didn't focus any energy on that part of

3  the reach.

4          The other parts beyond the two that we just read

5  have characteristics that would make them more boatable

6  than the ones that I believe are not navigable according

7  to this opinion.  And whether I'm prepared to say that

8  they would be navigable, I would not -- I would say I'm

9  not prepared to say that, but they are certainly more

10  boatable.

11  Q    But you would not testify that they're nonnavigable?

12  A    I do not intend to testify to that fact.

13  Q    And that would be from river mile zero to 3.3 you are

14  not prepared to testify that that's not navigable?

15  A    I will not express that opinion, yes.

16  Q    And the same question as to river mile 36.3 to river

17  mile 55?

18  A    I am not planning to testify that those are not

19  navigable.

20  Q    And from 60 to 80.5?

21  A    Same answer.

22  Q    Okay.  That -- from river mile to 60 to 80.5, you

23  will not be prepared to testify that it is not navigable?

24  A    That's correct.

25  Q    Can you explain more about your -- the statement you

1  just said about those general areas, that they are more

2  boatable.  What is your basis for saying that?

3  A    Well, for example, the Mosquito Flats area, which is

4  upstream from river mile 60, is a relatively flat,

5  meandering reach.  The flow depths, even at fairly low

6  flows, are reasonably substantial.  There are some

7  challenges to navigation in those regions relating to

8  woody debris and so on, but nothing there that in my

9  opinion would preclude use of the criteria boats that I

10  talk about in this report.

11  Q    And what about from 36.3 to 55?

12  A    That portion of the reach grades more toward the

13  nonnavigability, but still it's a relatively flatter

14  gradient than the other reaches.  It has less

15  obstructions, if I can use that term.  And so it's more

16  boatable than the reaches that I have the opinion that

17  they're not navigable.

18  Q    And what information did you collect or gather on

19  these more boatable reaches to determine that?

20  A    That's primarily from field observation, coupled with

21  information that I can obtain from mapping and aerial

22  photography, direct observation of the river in those

23  areas.

24  Q    Is it your analysis that the river in the more

25  boatable areas looks different than in the areas where you

1   have -- where your opinion is that it is not navigable?

2   A    There are differences, yes.

3   Q    What are those differences?

4   A    Well, the flow depths tend to be greater.  There are

5   less riffles and rapids in really shallow areas that would

6   make boating challenging.

7   Q    How do you know what the flow depths are in those

8   areas?

9   A    By observation.

10  Q    Not by direct measurement?

11  A    I did no direct measurements in those areas.

12  Q    Did you do any other analysis to come to that

13  conclusion, other than the things that we just talked

14  about, field observation, mapping, et cetera?

15  A    No.

16  Q    Why didn't you do modeling for those areas?

17  A    Well, as I said, those areas appeared to have

18  reasonably substantial depths.  I saw less obstructions to

19  boatability in those reaches, and I didn't feel it was --

20  I had to prioritize my resources, and I wanted to focus my

21  energy on the areas where it appeared to be questionable

22  whether it would be boatable or not.

23           Let me just clarify one point.

24  Q    Sure.

25  A    We did have one study site that we built a model for

1   and evaluated, that's in the Mosquito Flats area, that is

2   in one of the areas that I would say is more boatable.  So

3   in spite of what I said, we did do some direct

4   measurements in that particular area.

5   Q    Is that the site that your materials refer to as Site

6   N?

7   A    Yes.

8   Q    N as in Nancy?

9   A    Yes.

10  Q    Let's also go --  have this marked.

11           (Exhibit 2 was marked.)

12  BY MR. SCHECHTER:

13  Q    Dr. Mussetter, I've handed you what has been marked

14  as Exhibit 2 for purposes of this deposition.

15           Do you recognize this document?

16  A    I do.

17  Q    What is it?

18  A    It's actually Figure 2 from my expert report.  It's

19  an enlarged copy of it.

20  Q    And what does it show?

21  A    Well, it's an aerial photograph, satellite imagery of

22  the lower roughly 75 miles of the Mosquito Fork River.

23  And it shows river mile markers and then the locations of

24  the sites where we did our detailed studies.

25  Q    I just wanted to get Exhibit 2 on the record so that

1    if you or I want to refer to it easily it's out there and

2    it's already entered and we can talk about it.  But we can

3    set it aside for now.

4    A    Okay.

5    Q    So I think we established earlier that the opinions

6    on pages 1 and 2 of Exhibit 1 are the complete list of

7    your opinions to be rendered in this case; is that

8    correct?

9    A    That's correct.

10   Q    Okay.  Have any of these opinions -- are any of these

11   opinions the result of changes that you made as a result

12   of errors found in a previous version of your report?

13   A    The basic opinions are the same.  The detailed

14   quantitative values that are listed in here to support

15   those opinions have changed as a result of that error.

16   Q    And the error was in your expert report dated

17   December of 2014?

18   A    That's correct.

19   Q    And how did the opinions on pages 1 and 2 of Exhibit

20   1 change as a result of the errors you found?

21   A    Well, I think I just explained that conceptually.

22   Some of the quantitative numbers, in terms of the numbers,

23   the discharges that would limit boatability, the number of

24   days when it would or would not be boatable changed as a

25   result of correcting that error.

1  basically defines the horizontal position.  And then we do

2  the same process of deciding, where does it fall relative

3  to the reference plane.  And then we build across in that

4  direction.  So it's not truly random locations.

5  Q    Okay.  So -- and the rock that you're sampling, is

6  that from the sediment sampling locations that are shown

7  on your survey sites?

8  A    From the pebble-count samples, yes.

9  Q    Okay.

10  A    The linear samples across the cross-sections.

11  Q    So let's -- let's look at page 2 for Site P-8.  Make

12  sure we're all talking about the same things.

13         So the limiting section here is XS-8

14  cross-section eight; is that correct?

15  A    I believe that's correct.  Yes.

16  Q    Okay.  And the sampling locations for this field site

17  are just upstream of cross-section 9, at cross-section 7,

18  and at cross-section 3; is that correct?

19  A    Yes.

20  Q    So what happens with the sampling location?  Is it

21  one scoop?

22  A    No, it's -- it's a sampling of all the material that

23  falls across that cross-section line.

24  Q    Okay.  So you go all the way across the cross-section

25  line?

1   A    Right.

2   Q    Okay.  Do -- in riffles and bars, do rivers sort

3   material upstream to downstream?

4   A    Well, they sort material.  I wouldn't necessarily say

5   upstream to downstream.  But there is a hydraulic sorting

6   effect.

7   Q    So is the material at the upstream side of a riffle

8   or bar necessarily representative of what's at the

9   downstream edge of the riffle or bar?

10  A    Within a given geomorphic feature, generally the

11  distribution of particle sizes is fairly consistent,

12  certainly within the riffles, they are.  There's some

13  sorting effect.  There's some variability for sure, but

14  generally we picked our sampling locations in places where

15  we felt the sample distribution would represent the range

16  of sizes that were present in that riffle, if it was a

17  riffle sample.

18  Q    So now you've placed the rocks into your -- into the

19  eight-foot channel?

20  A    Right.

21  Q    Okay.  Now what do you do?

22  A    Well, as we discussed, we have a distribution of the

23  highest rocks that occurred within there, the tops of the

24  highest rocks that occurred within that.  We've picked the

25  median value of that.  And we base the -- that becomes the

1   height that we base our required depth on.  In other
2   words, we need to have enough depth above that particular
3   rock to float the boat.
4   Q    Okay.  Now once you -- we'll come back to how that
5   works a little bit later.  All right.  So now you have the
6   depth?
7   A    Right.
8   Q    And what the limiting depth is, how do you apply that
9   to the rest of your work?  What happens next?
10  A    Well, then we compare, from the model results, the
11  water surface elevations, correlated with the discharges,
12  and we basically figure out what is the -- what is the
13  discharge that would create just enough height in the
14  water surface elevation to give you the required draft for
15  whichever version of the draft we're analyzing.  If it's
16  12 inches, we want to have 12 inches of depth above that
17  rock.
18  Q    And that's it?  Then you're done?
19  A    Well, then you go back to the flows record and figure
20  out how often that happens.
21  Q    And then you're done?
22  A    Then you're done.
23  Q    Okay.  Then you write a big report, you get paid,
24  it's all good.  Something along those lines?
25  A    Something along those lines.  Okay.  And then you get

1    to answer a lot of questions about it later.

2  Q    And keeps everybody in business.

3          Let's talk about boats.

4  A    Okay.

5  Q    You based your analysis on a specific type of boat?

6  A    I used two specific boats to support my analysis,

7  yes.

8  Q    Okay.  And how did you -- what were those boats?

9  A    There was -- we talked about this earlier --

10  the roughly 20-foot small poling boat, and then a 30-foot

11  river boat.

12  Q    30 feet?

13  A    Roughly 30 feet.  It's a little less than 30.

14  Q    And what kind of load in those boats?

15  A    The criteria boat, I assumed -- well, for the

16  criteria load in boat was the river boat, with a

17  2,000-pound load.

18  Q    Did you evaluate any other loads?

19  A    Yes.  I looked at a thousand pounds up to, I believe,

20  3,000 pounds.

21  Q    Why did you evaluate all those if the criterion load

22  was 2,000?

23  A    Because I wanted to see what the sensitivity and the

24  variability of the required draft would be.

25  Q    And how did you determine what boat type and load to

1  use in your analysis?

2  A    Primarily through discussions with the historian for

3  the U.S.

4  Q    And you said "primarily."  Were there any other --

5  anything else that helped or decided how you would

6  determine what boat type and load to use?

7  A    Well, I had some discussions with some of the other

8  BLM folks about types of boats and so on.  But I -- again,

9  my selection of the 2,000-pound load and the river boat

10 came essentially from the historian.

11 Q    Is that Mike Brown?

12 A    Mike Brown.  A different Mike Brown from the one we

13 were previously referring to.

14 Q    That isn't confusing at all.

15       Do you agree with Mike Brown's opinion about

16 boat type?

17 A    I have no basis to agree or disagree.

18 Q    Is that the same criterion boat that you used in

19 other navigability analyses?

20 A    No.

21 Q    What have you used in other navigability analysis?

22 A    The only other place where I explicitly defined the

23 character of a criteria boat was for the Yadkin River.

24 And I don't remember the exact dimensions, but it was a

25 much larger boat with -- I think the draft was somewhat on

1   the order of three feet in that case.

2   Q    Is that a much larger river?

3   A    The Yadkin is bigger than the Mosquito Fork, yes.

4   Q    Is there a river in Alaska that it would be

5   comparable to in terms of size?

6   A    Well, the geomorphology is quite different, so it's

7   hard to compare.  But flow-wise, I'm sure there are rivers

8   here that have similar total quantities of flow.

9   Q    And did you pick the criterion boat in the Yadkin

10  case?

11  A    No.

12  Q    Who did?

13  A    Input from the historians.

14  Q    Do you think that the criterion boat that you've been

15  given is the only kind of boat that can be used for trade

16  and travel on the Mosquito Fork?

17  A    No, I don't think it's the only kind.

18  Q    What other types of boats do you think could be used?

19  A    I'm not prepared to say.  I mean, I'm simply not

20  prepared to restrict it to say the only boat that could

21  have been used would be that river boat.  I'm sure there

22  could be a wide variety of other boats.

23  Q    So do you think smaller boats than the criterion boat

24  could have been used on the Mosquito Fork for travel and

25  trade?

1    A    Again, I'm basing my opinion in that regard on the

2    input that I've gotten from Mr. Brown, and so I've stated

3    my opinion.

4    Q    And your opinion is related only to the criterion

5    boat and that you have no ability to change from the

6    criterion boat?

7    A    If I had a sound basis to do it, but that was not

8    part of my study.

9    Q    You were directed to use the criterion boat?

10   A    I wasn't directed to use it, but it was recommended

11   from the work that Mr. Brown did.  His role was, at least

12   in part -- I don't know all the things he was asked to do,

13   but one of the things was to evaluate the types of boats

14   that could have been used -- that would have been in

15   customary use at the date of statehood in that area of

16   Alaska, and that was his conclusion.

17   Q    Did you review his reports?

18   A    I did a -- sort of a high-level review of them.

19   Q    Why weren't they included in your references?

20   A    Because at the time I wrote this report I didn't have

21   access to them.  I had not read them before I wrote the

22   initial report for this.

23   Q    When did you read them?

24   A    Probably in the January time frame of this year.

25   Q    And so how -- how did you receive -- so could you

1  describe Mr. Brown's communication with you as to the
2  criterion boat and why he believed it was this boat?
3  A    Generally, he didn't give me a lot of the detailed
4  reasoning behind why he chose this boat.  But we talked
5  about the various possibilities for kinds of boats that
6  could be used, and his conclusion was that this would be
7  the minimum size and load-carrying capacity that could
8  have been commercially viable.  That was my understanding
9  of his recommendation to me.
10 Q    Did he give other reasons for that?
11 A    Other reasons?
12 Q    Other reasons for why this boat and not the wide
13 variety of boats that you discussed?
14 A    I don't recall the specifics of that.
15 Q    Do you remember any reasons generally?
16 A    Generally, I think he felt that it needed to be a big
17 enough boat to carry a load that would be commercially
18 viable.  But you'd have to ask him those questions.  I
19 can't really see into his mind.
20 Q    Did his communication come -- was it phone call or
21 e-mail?
22 A    A phone call and some in-person discussion during one
23 of the field reconnaissance efforts.
24 Q    Is the Mosquito Fork boatable for boats smaller than
25 the criterion craft?

1  day?

2  A    It's a day when there's enough water in the river

3  that you can float or maneuver your boat through the

4  reach.

5  Q    And so what does that mean in the context of this

6  specific reach?  What is a boatable day on the Mosquito

7  Fork?

8  A    Well, if you -- if there's enough water in the river

9  that you can maneuver the 28-foot river boat with a

10 2,000-pound load through the reach, then that's a boatable

11 day.

12 Q    And let's -- I think we might be looking at page 57

13 in a little bit.

14            Does running aground make the river unboatable?

15 A    Well, I wouldn't consider -- hitting rocks, stopping,

16 dragging the boat, is not boating.

17 Q    Well, so let's unpack that a little bit at a time.

18 What does running "aground" mean to you?  You use that

19 phrase specifically on page 57.

20 A    Right.  It means you hit the ground; stops the boat.

21 Q    Stops completely.  That's running aground?

22 A    Yes.  Running aground generally means it stops.

23 Q    Okay.  Is that the standard you used in reaching your

24 opinions about the necessary flows for boatability?

25 A    Not necessarily.  I mean, the limiting depths were

1    based on that exact height where you would hit the rock.

2    Q    Okay.  Is that the -- the ability to traverse through

3    each of the study sites, that is the language you used --

4    A    I think that's the language I used, yes.

5    Q    Okay.  So can you explain to me the difference

6    between running aground and not being able to traverse

7    through each of the study sites, or are they synonymous?

8    A    They're more or less synonymous, although you -- you

9    know, in the context of our discussion a few minutes ago,

10   if you're in a wooden boat and you're hitting rocks,

11   that's probably not a good thing, and I don't think you'd

12   want to be traversing through the reach on a commercial

13   basis under those conditions.  You might be able to make

14   it through.

15   Q    All right.  So if we have one CFS less than the flows

16   you have in Table 6, the boat will run aground?

17   A    It will hit the rock.

18   Q    Does that mean it will run aground?

19   A    Not necessarily.

20   Q    What does it mean?

21   A    It means it will hit the rock.

22   Q    Okay.  Is that game over, the day's unboatable?

23   A    Not necessarily.  Depends on how hard you it and

24   whether you -- whether it damaged your boat and so on.

25   Q    It seems necessary, from your table, though.  Are

1    your boatable days bright lines?  Above and below a

2    certain number is boatable -- above the number is

3    boatable; below the number is unboatable?

4    A    Well, in any quantitative scientific study there is a

5    fuzzy band around a number that you come up with.  The

6    width of that fuzzy band varies.  You know, if I said that

7    the limit is 280 and you said, at 279 can you get through,

8    you still might be able to get through.  If you said, it's

9    285, am I absolutely sure I'm not going to hit the rock,

10   yeah, you still might hit the rock.

11   Q    Dr. Mussetter, how big is your fuzzy band?

12   A    I have no response to that.

13   Q    Well, I mean, it's an important question here.  I'm

14   being a little glib, but -- I'm trying to understand.  So

15   your analysis tells us, at these flows the river is

16   boatable and below that it's not boatable.  And so what

17   happens -- I mean, how big is the fuzzy band and what

18   happens to the boat, to your criterion craft, in that

19   fuzzy band?  What is happening to the operator, what's

20   going on with him, where the reach becomes not passable?

21   A    Well, what you're trying to do is get me to give you

22   an absolutely precise answer, and I can't do that.  What I

23   would say is that, under the conditions, if you're -- if I

24   say it's -- I'm going to pick a number -- 280 CFS is the

25   threshold based on my analysis.  The first thing is, when

1    I say 280, that's probably rounded off to the nearest 10.

2    So a precise number, if you dig into the spreadsheet,

3    might have been 283 or 277 or something.  Okay.

4            And I would say, given all the things you need

5    to think about for commercial liability, if you're -- if

6    you're below that number in terms of the discharge, the

7    odds are you might be okay and you might not be okay.  And

8    the farther you get away from that number, the more

9    certainty you have that you're not going to be okay.

10           And on the other side of that line, 5 CFS, 10

11   CFS, you may get through without hitting the rock.  The

12   odds are you're going to hit the rock.  And the farther

13   away you get from that 280, the more likely you are to

14   make it through without hitting the rock.

15           So that's the most precise answer that I can

16   give you.

17   Q    Okay.  And -- all right.  So let's talk about this in

18   terms of worst day, P-8.

19   A    Okay.

20   Q    That's the most limiting reach?

21   A    Yes.

22   Q    And it requires significantly more flow than any of

23   the other reaches; is that fair to say?

24   A    Yes.

25   Q    You know, in the order of one and a half to two times

1  more, or more; is that fair?

2  A    It's a very shallow riffle there.

3  Q    And let's say you're -- and can we also agree that

4  there's a pretty -- there's a -- probably in most cases,

5  depending on which rock you're using, a couple hundred CFS

6  band between the next most limiting reach and P-8?

7  A    We're on --

8  Q    Table 6, page 7.

9  A    In some cases, there are a few hundred CFS range --

10  there is a 2- to 300 CFS range.

11  Q    Or 600?  The highest rock, a 15-inch craft [sic] --

12  15-inch draft -- 560 is the next -- excuse me -- 680 --

13  580; my math is terrible today.  I'm sorry.  650 was

14  right.  I'll try that again:  550 was correct.  There's a

15  550 CFS difference.

16  A    I don't actually see the number you're talking about.

17  Q    So on Table 6, it's -- the draft -- the minimum

18  indicated draft for the highest particle, which is -- for

19  Site P-8 --

20  A    Yes.

21  Q    -- is 1210 CFS?

22  A    Yes.

23  Q    The next highest is 660 CFS, at P-2?

24  A    Oh, I see.  Among sites?

25  Q    Yes.

1  A    Yes.  Yes, it varies among sites.

2  Q    Okay.  So -- and P-2 and P-8 is a poor example.

3  Let's use P-8 and P-9.

4  A    Okay.

5  Q    All right.  So we still have a -- a large five -- 4-

6  or 500 plus CFS difference?

7  A    Yes.

8  Q    Okay.  Now, so river's rip-roaring along at 800,

9  900 --

10  A    Okay.

11  Q    -- a thousand, 1100.  River's 1100 CFS that day.

12  Everything else on the river is completely inundated.  You

13  would agree that every other site is much more than

14  boatable for that 15-inch boat?

15  A    Based on my analysis, it would be boatable, yes.

16  Q    Okay.  Now we get to P-8.

17  A    Right.

18  Q    We're running 1100, 1150 CFS; we're a little bit

19  below.  Is now the whole reach of the river unboatable?

20  A    I didn't say that.

21  Q    But your numbers do.

22  A    No, they don't.

23  Q    You don't believe that that -- that your boatable

24  days -- that that would be a non-boatable day on your next

25  chart?

1  A    That would be a day that you couldn't boat through

2  that particular site.

3  Q    So we're looking at the river as a reach, right?

4  A    Yes.

5  Q    And we're looking at it from mile -- at this in

6  particular -- from 3 to 33.5?

7  A    Right.

8  Q    Let me get that wrong again.  Excuse me.  From 3.3 to

9  36.3?

10  A    Right.

11  Q    Okay.  We're trying to figure out what days the river

12  is boatable or not?

13  A    Right.

14  Q    And you've looked at a number of these limiting sites

15  and said, oh, okay, we're going to try and figure out what

16  is going derail us --

17  A    Right.

18  Q    -- on those particular days.  So now I have a day

19  where there's a lot of water in the river for most of

20  these sites, and I get to a place in the river where I'm

21  just a little bit below.

22           Is that a boatable or unboatable day?

23  A    You're probably within the fuzzy band, and so I would

24  say the odds are you're going to have a problem passing

25  through Site P-8.

1          But that's a question that goes beyond the

2    question I was asked to answer.  I can tell you, among the

3    suite of eight sites I analyzed, the frequency and the

4    conditions under which you could physically float through

5    the reach.  That needs to be combined together with the

6    other questions, with the other information, to decide

7    whether it meets the standard for navigability.

8    Q    If we -- if we'd run through all those other

9    questions, we have a criterion boat, we have the ordinary

10   and natural condition of the river, we have a commercially

11   viable load on that boat, aren't we down to how boatable

12   or non-boatable is the river?  That's the last question --

13   that's your question, isn't it?

14   A    Yes, and I've answered that.

15   Q    Okay.  And so you think, even though you say that

16   that particular reach, Site P-8, is not boatable, maybe

17   for purposes of the greater navigability picture, if

18   you're running that high in your fuzzy band, right, you

19   are well over the numbers for all the other sites in the

20   reach, maybe you have a boatable day?

21   A    I think I've answered that.  If you're asking me, do

22   you have to have a minimum of 1210 CSF in the river to

23   traverse the reach in the criteria boat, no, I'm not

24   saying that.

25   Q    What does it mean to not traverse the reach?  What

1  happens when you -- what happens on your not boatable day

2  on that reach?

3  A    Well, and -- you'd need several places -- places that

4  would basically obstruct your progress to the point where

5  it no longer becomes commercially viable to basically drag

6  your boat down the river.

7  Q    Several places in one reach?

8  A    Well, in the segment 3 to 36.3.  Or 3.3 to 36.3.

9  Q    But -- all right.  So to be clear:  Your not boatable

10 day, it could be a drag; it could be a stop; it could be

11 running aground and destroying the boat; it could be a

12 range of things?

13 A    A boatable day or a non-boatable?

14 Q    A non-boatable day.

15 A    A non-boatable day?

16 Q    As you use it in Table 7.

17 A    Generally, running aground and destroying the boat is

18 a non-boatable day.

19 Q    I agree.

20 A    Okay.

21 Q    But what I'm asking is:  What are the things that you

22 believe will happen as a result of the flow not being

23 above the limiting rock that makes it a non-boatable day?

24 A    Well, if there are enough of those places along the

25 reach --

1  Q    Not along the reach, along one cross-section.

2  Because, as you've told me, you're doing it on a

3  cross-section by cross-section basis.

4  A    Okay.  By the definition that I've used for boatable

5  days at the individual sites, if you hit a rock, then that

6  makes it a questionably boatable day.  It's questionable

7  whether it's boatable or not.

8  Q    It makes it a non-boatable day, if you're below that

9  number?

10  A    Based on the assumption, yes.

11  Q    Okay.  And what I'm trying to clarify is, you're not

12  really making a statement as to what the impact to the

13  boat is going to be, and the operator.  It could be a

14  drag; it could be the boat is destroyed; it could be a

15  range of things?

16  A    The conditions for these thresholds are:  Are you

17  likely to hit the rock?

18  Q    Okay.  And what -- so the next -- my next question

19  is:  What does it mean to hit the rock?  Is that just

20  tapping it?

21  A    If the flow is substantially less than that, you're

22  going to -- you're very likely to run aground; you're

23  going to hit the rock hard; you're going to damage your

24  boat; you're to have a problem.

25  Q    But, I mean, if it's -- if it's in the fuzzy band, it

1  could be a lot of things.  It could be a drag; it could

2  run aground; it could be nothing?

3  A    Could be.

4            THE REPORTER:  Can we have a break?

5            MR. SCHECHTER:  Yes.

6            THE REPORTER:  Thank you.

7            (Recess taken.)

8  BY MR. SCHECHTER:

9  Q    When you say "hit," is -- do you mean "touch"?  There

10  will be contact between the rock and the boat?

11  A    Well, for the precise limit I've calculated, that

12  would be a touch, yes.

13  Q    And if -- and in that boat, in the criterion boat,

14  you got one guy and 2,000 pounds and the motor and 25

15  gallons of fuel, right?

16            And if the 170-pound guy pops out of the boat,

17  is the boat going to get over the obstacle?

18  A    And maybe the guy?  Probably.

19  Q    Okay.

20  A    If it's just barely touching.

21  Q    Well -- okay.  Let's talk about the pitch and

22  vertical accelerations.  Is -- do those come about from

23  the riffles themselves or from the boat's travel

24  downstream on the water?

25  A    The assumption with the downstream travel is that the

1  pitch comes about because of the roughness of the water

2  and the action of the boat as it's going down through the

3  waves.

4  Q    So is it -- is it momentary that that 13 inches is

5  required, that extra draft is required?

6  A    Well, I'd call it periodic.  It's not always at that

7  depth.

8  Q    And how is that accounted for in the

9  boatable/non-boatable analysis?

10 A    Well, it's just another one of the factors.

11 Q    It's something for someone else to consider when

12 seeing, is it boatable -- are these boatable days made for

13 a navigable or nonnavigable river?

14 A    No, I'm saying that if you -- you know, if you go

15 down through the reach, and the rock is within that zone,

16 and you're going through rough water, and the boat's going

17 like this (indicating), you're liable to hit the rock.

18 Q    Well, at least touch the rock.

19 A    Those are your words.

20 Q    And we talked about "touch" versus "hit."  I mean, at

21 the exact number it will touch?

22 A    At the exact number it will touch.

23 Q    Which under the calculations that you did would be a

24 non-boatable day for that reach?

25 A    Based on the criteria I applied, yes.

1          MR. SCHECHTER:  Can we have another time out?

2          (Recess taken.)

3   BY MR. SCHECHTER:

4   Q    Dr. Mussetter, do you have any changes or corrections

5   you want to make to any of your earlier answers?

6   A    No.

7          (Exhibit 5 was marked.)

8   BY MR. SCHECHTER:

9   Q    Dr. Mussetter, you've been handed what has been

10  marked as Exhibit 5 for purposes of this deposition.

11          Do you recognize this document?

12  A    I do.

13  Q    What is it?

14  A    It appears to be the Supreme Court syllabus of the

15  Supreme Court ruling in the PPL Montana versus Montana

16  case.

17  Q    And you refer to PPL Montana on page 24 several times

18  in your report; is that correct?

19  A    I'm not sure "several" is correct, but I certainly

20  did refer to it.

21  Q    At least once?

22  A    At least once.

23  Q    Maybe twice?

24  A    Maybe.

25  Q    And is this the case that you're referring to when

1  you mention it in your report?

2  A    I believe so, yes.

3  Q    Okay.  And is this pagination, this page 24, the

4  correct page 24?

5  A    Well, I'm having trouble finding the precise

6  language.  Let's see.

7  Q    I would represent that it might be midway through the

8  top paragraph, the sentence that starts with "while."

9  A    Oh, yes.  Sorry.  I see that now.  Yes.

10  Q    And so this -- this is -- is this where the phrase

11  "commercial reality" comes from in your report, what

12  you're referring to?

13  A    Yeah.

14  Q    What does "commercial reality" mean as you've applied

15  it in your report?

16  A    Well, I think, from a -- just a common language use

17  of the words, it means that you could -- in the context as

18  they describe it here, it has to be long enough that you

19  could -- it has to be navigable for a long enough period

20  that you could do a viable commercial operation that, you

21  know, is practical.

22  Q    What is "it" in that sentence?

23  A    Well, in this case, carry -- or carry out some

24  commercial activity on the river with a boat.

25  Q    And what do you mean in your -- is that what you mean

1  that?

2  A    Boat.  Float the boat.  I did not mean it in the

3  legal term -- in the legal sense of the term, if that's

4  what you mean.

5  Q    I'm asking what you meant.

6  A    That's what I'm telling you.

7  Q    Have you interviewed anyone who's been on the

8  Mosquito Fork?

9  A    Have I interviewed anyone?

10  Q    Yeah, who has boated on the Mosquito Fork.

11  A    I've spoken with people who have boated on the

12  Mosquito Fork.

13  Q    Like who?  Who did you speak with that's boated on

14  the Mosquito Fork?

15  A    Well, Mr. Kim Fellows.  said, like who.  I'm sorry, I

16  didn't hear what you said.

17  Q    That's my fault.

18  A    Mr. Kennedy, for one.

19  Q    Anybody else?

20  A    There's another gentleman with the BLM who has.  He's

21  a ranger in that area.  His name is Kevan Cooper.

22  Q    Anybody else?

23  A    Mr. Fuller.

24  Q    Anyone else?

25  A    I don't recall anyone else.

1  Q    Did -- did those folks tell you about what kind of

2  boats and flows were involved when they were boating on

3  the river?

4  A    Mr. Kennedy certainly related some of his

5  experiences.

6  Q    What were those experiences?

7  A    Well, that he was able to do it at higher flows.

8  And, based on his experience, it wasn't a good idea to try

9  it at the flows when we chose not to do the float trips

10  that we had planned.

11  Q    By "higher flows," what range are you talking about?

12  A    Gosh, I don't know.  I think we were generally in the

13  range of 4- to 500 CFS, we felt would probably be enough

14  to do it.  But I -- you know, that's, again, a fuzzy thing

15  to me.  I don't remember the precise words that we used.

16  Q    Did -- was -- did you talk about what kind of

17  boats -- what kind of boats he used?

18  A    Yes.

19  Q    What did he use?

20  A    I think he's done it -- I think he told me he's done

21  it with a Alpaca Pack raft.  Or he -- whether he has

22  actually done it or whether he said that would be an

23  appropriate craft, I'm a little fuzzy on at the moment.

24  And then a raft.

25  Q    And do you mean like a one-person pack raft, sort

1  of --

2  A     The Alpaca is a one-person raft that you can carry.

3  Q     And would it -- would it be your opinion that the

4  pack raft would not -- whether it got down the river or

5  not -- add much in terms of your analysis?

6  A     I don't think it can give us very much information on

7  the navigability of the Mosquito Fork.

8  Q     Okay.  And what about Mr. Kennedy -- excuse me -- Mr.

9  Cooper or Mr. Fuller?

10  A     Well, I've -- I've not actually directly discussed it

11  with Mr. Fuller, but -- you asked me whether I talked to

12  anyone who had.  I've read his reports, so I know what

13  I've read in his reports.

14  Q     And Mr. Cooper?

15  A     And Mr. Cooper, I'm not sure I've actually directly

16  discussed with him his experiences in boating the river.

17  He looked at my results and, just from a high level, said,

18  yeah, those look like reasonable numbers to me.

19  Q     Did he look at the original report or the revised

20  report?

21  A     He probably looked at the original report, actually,

22  and I expect he was more looking at the draft numbers than

23  the actual discharges.  I don't know.

24  Q     Did -- so did you take into account Mr. Kennedy's

25  trips at all in calibrating your analysis?  Did you have

1   enough information to be able to make useful information

2   from that?

3   A    No.

4   Q    Did you learn anything qualitatively about the river

5   from these folks?

6   A    Well, sure.  In the case of Mr. Kennedy, I certainly

7   learned that, in his opinion, the river wouldn't be very

8   boatable in the 2- to 300 CFS range, and it wouldn't be a

9   good idea to try it.  And we talked about other things

10  related to his experience, measuring flow and so on.

11  Q    Let's talk about the area around Chicken a little

12  bit.  You -- you have not floated above or below Chicken;

13  is that correct?

14  A    I have not floated on the Mosquito Fork.

15  Q    Did you assess any of the river characteristics below

16  Chicken?

17  A    I -- I looked at them from the helicopter.  I looked

18  at my photographs.  As I related this morning, I went to

19  the river on the ground around the mouth of Chicken Creek.

20  I did no other quantitative evaluations.

21  Q    Okay.  And that would be roughly river mile zero to

22  3.3; is that --

23  A    That's about right.

24  Q    And do you have any thoughts on the similarity of the

25  river in mile zero to 3.3 with the segment above that?

1   A    Well, the one thing I know is that it's been heavily

2   disturbed by dredging activity, and so I didn't pay a lot

3   of attention to it because I didn't feel that what I was

4   seeing was a natural condition, and I focused my energy

5   upstream.

6   Q    And -- and that area's been found navigable?

7   A    Well, the parties have agreed that it is navigable

8   for legal purposes.  Whether it -- you know, if you went

9   in and did a rigorous scientific analysis of the

10  navigability of that reach, I'm not sure what you would

11  find.  I don't think it was found to be navigable strictly

12  on the basis of you can float the criteria boat through

13  it, necessarily.

14  Q    Do you have any thoughts about whether you could get

15  the criterion boat through there or not?

16  A    At some flows I'm sure you could, and other flows I'm

17  not really sure.

18  Q    But it's not in its natural conditions, though,

19  it's --

20  A    That's right.

21  Q    So it wouldn't tell us anything about the

22  navigability question just from floating?

23  A    In my view, it would not add value to the study, no.

24  Q    Do you have -- are you aware of any data that

25  suggests that the flows in that area are different than

1  the flows above?

2  A    I wouldn't say I have any data.  I expect they are

3  marginally different at some times because of flows from

4  Chicken Creek.  But that's probably fairly insignificant.

5  So they're similar.

6  Q    So for the area from approximately river mile 3 to

7  upstream of the Taylor bridge and the area between river

8  mile 6 and 7, your report discusses how they may not be in

9  their ordinary and natural condition due to some dredging

10 activities; is that fair?

11 A    I do mention that there are some dredging activities

12 in that area, yes.

13 Q    Okay.  So particularly for river mile 6 and 7,

14 between river mile 6 and 7, how can you determine

15 navigability if you have not reconstructed the

16 pre-disturbance condition?

17 A    I thought we were talking about the Taylor Highway

18 bridge.

19 Q    We can talk about that one first.  But same question.

20 A    I based my opinion about the overall -- the

21 navigability of the overall reach on -- specifically on

22 the sites that I studied.  I didn't study that site.

23 Q    That would be true between 6 and 7 as well?

24 A    Now, we've gotten totally confused.

25 Q    Sorry.

1    A    My previous statement referred to mile 6 and 7.  We

2    did study the area around the Taylor Highway bridge.

3    Q    Okay.  And so you have not studied the area around 6

4    and 7?

5    A    That's correct.

6    Q    Okay.

7    A    Except, perhaps, if Site 8 is within that range.  It

8    looks like it may be within mile 7.  I'm not sure of the

9    exact river mile of that.  We studied Site P-8.  So --

10   okay, it's 7.7, so it doesn't apply.

11   Q    Okay.  So then I guess the question is:  How -- so

12   you're making your assessment of the overall reach based

13   on the areas that you studied.  So you haven't -- you

14   haven't done anything to reconstruct the pre-disturbance

15   condition in that area?

16   A    I have not.

17   Q    Okay.  You have not assessed commercial recreation

18   potential on the reach; is that correct?

19   A    Commercial recreation potential?

20   Q    Yes.

21   A    No, I have not.

22   Q    Okay.  And that was not a part of your criterion

23   craft in your considerations?

24   A    That's correct.

25   Q    And you're not a historian?

1    A    I am not a historian.

2    Q    Okay.  You have no particular expertise in historical

3    craft or poling boats or the river boat, things like that?

4    A    Only to the extent that I've done technical analyses

5    of those for this report that we've talked about today.

6    Q    Based on the information provided to you?

7    A    That's correct.

8    Q    Okay.  You didn't do your own historical analysis and

9    research to find those materials?

10   A    I did not.

11   Q    Okay.  To go back to HEC-RAS very generally for a

12   second.  I know we talked about that there was a plus or

13   minus .1 error you were estimating for the analysis that

14   you did here in HEC-RAS.

15            Is there -- what is your sort of general

16   perspective on error in HEC-RAS in other projects that

17   you've done?  What's the general range of error?

18   A    Well, first, I want to clarify:  The statement I made

19   earlier, if I remember it correctly, I said that the

20   deviation between the rating curve -- the gauge rating

21   curve and the predicted values for some of the discharges

22   was in the range of a tenth of a foot.  So I didn't mean

23   to imply from that that all the models were accurate to

24   within a tenth of a foot or less or more.  I wasn't

25   speaking general error bands on models.

1        But with respect to your other question, I'm not

2 sure I can give you a number. It really depends on the

3 size of the river and the nature of the analysis, how

4 critical it is to be absolutely precise, how much data you

5 have. And I think, you know, that would be the main --

6 the main focus.

7 Q   Well, what's the -- what error range have you seen on

8 the low end with HEC-RAS?

9 A   If you have a lot of data, a lot of good measurement

10 data over a broad range of flows and you really dial in

11 the coefficients, you can get it -- you can get it within

12 a tenth or so, generally.

13 Q   Okay. And what about at the high end?

14 A   Oh, there are cases where you can be a foot or more

15 off.

16 Q   And in this particular case, what -- where -- you

17 know, considering the data that you've collected and the

18 information -- the analyses that you've done, what would

19 you -- where would you place the HEC-RAS error?

20 A   Well, the only specific data we have to evaluate is

21 the rating curve that we talked about. And if we

22 calibrate it to that curve, to within about a tenth over

23 the full range of flows, maximum of a tenth, and in other

24 places much better than that, the calibration to the low

25 flow measurements, there's probably somewhat more