CRAIG W. RICHARDS
ATTORNEY GENERAL
Jessica Moats Alloway (Alaska Bar No. 1205045)
Michael S. Schechter (Alaska Bar No. 1405044)
Assistant Attorneys General
Department of Law
1031 W. 4th Avenue, Suite 200
Anchorage, AK 99501
Telephone: (907) 269-5275
Facsimile: (907) 276-3697
Email: jessie.alloway@alaska.gov
       mike.schechter@alaska.gov
Attorneys for the State of Alaska

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| STATE OF ALASKA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 3:12-cv-00114-SLG |
| | ) |
| UNITED STATES OF AMERICA; | ) |
| CHICKEN VENTURES, LLC, an Alaska | ) **STATE OF ALASKA'S** |
| limited liability company; GEORGE W. | ) **SUPPLEMENTAL MEMORANDUM** |
| SEUFFERT, SR.; GEORGE W. | ) **IN SUPPORT OF AWARD OF** |
| SEUFFERT, JR. | ) **ATTORNEY'S FEES AND COSTS** |
| | ) |
| Defendants. | ) |

Pursuant to the Court's May 3 Order re Attorney's Fees (Dkt. 103), Plaintiff State of Alaska ("State") files this supplemental memorandum in support of award of attorney's fees and costs. This memorandum, and the supporting documentation, details the reasonable expenses, including attorney's fees, incurred by the State during the course of this litigation as a result of the United States' bad faith. It amends and updates the

billing report previously offered by the State.[1] The State also provides the documentation necessary to support its request for costs as the prevailing party. Under 28 U.S.C. § 2412(a), the State is entitled to costs in the amount of $10,712.76,[2] and under 28 U.S.C. § 2412(b) an award of attorney's fees and expenses in the amount of $989,742.16.[3]

**The State is entitled to recover all reasonable fees and expenses incurred during the course of this litigation traceable to the United States' bad faith.**

The Court may award attorney's fees for the entire course of the litigation, including the time spent preparing and defending an award of attorney's fees, if it finds "that the fees incurred during the various phases of litigation are in some way traceable to the [United States'] bad faith."[4] Under § 2412(b), the Court may award "reasonable fees and expenses." Unlike § 2412(d), this provision does not set a fixed limit on the hourly

---

[1] *See* Declaration of Jessica M. Alloway, Dkt. 92.

[2] *See* Declaration of Jessica M. Alloway in Support of State of Alaska's Bill of Costs filed herewith.

[3] *See* Declaration of Jessica M. Alloway in Support of State of Alaska's Award of Attorney's Fees and Expenses filed herewith. Of the amount of fees and expenses requested, $3,380 is directly traceable to the United States' bad faith in failing to admit that the river was in its natural and original condition after it provided its expert report.

[4] *Brown v. Sullivan*, 916 F.2d 492, 497 (9th Cir. 1990) (citing *General Fed'n of Women's Clubs v. Iron Gate Inn, Inc.*, 537 A.2d 1123, 1129–30 (D.C. App. 1988) ("The law is well established that, when fees are available to the prevailing party, that party may also be awarded fees on fees, i.e., the reasonable expenses incurred in the recovery of its original costs and fees.")); *see also Rodriguez v. United States*, 542 F.3d 704, 713 (9th Cir. 2008) (same).

*Alaska v. United States et al.* 3:12-cv-00114-SLG
SOA's Supplemental Mem. in Support of Award of Fees and Costs Page 2 of 13
Case 3:12-cv-00114-SLG   Document 106   Filed 06/07/16   Page 2 of 13

rate courts award the prevailing party for their legal services and expenses.[5] In determining a "reasonable" award courts normally calculate the "lodestar" amount by multiplying the number of hours reasonably expended by a reasonable hourly rate.[6] The lodestar figure is based on prevailing market rates for attorneys of comparable skill and standing in the relevant legal community.[7] Even under the more limited provision in § 2412(d), "fees and other expenses" are defined to include "the reasonable expenses of expert witnesses, the reasonable costs of any study, analysis, engineering report, or project which is found by the court to be necessary for the preparation of the party's case, and reasonable attorney's fees."

The applied hourly rate and the reasonable fees and expenses fairly traceable to the United States' bad faith are detailed in the Declaration of Jessica M. Alloway, submitted herewith.[8]

### 1. The requested fees are fairly traceable to the United States' bad faith.

The United States' frivolous position "that only 'freighting' or commercial use could be considered as a matter of law,"[9] and that binding precedent only applied to the

---

[5]  *See Brown*, 916 F.2d at 495 (comparing § 2412(b) (allowing for an award of attorney's fees at a reasonable market rate) with § 2412(d) (setting a statutory limit on the amount of attorney's fees that can be awarded)).

[6]  *Costa v. Colvin*, 690 F.3d 1132, 1135 (9th Cir. 2014); *Bonnichsen v. United States*, 2004 WL 2901204, *7 (D. Or. December 15, 2004) (citing *Kerin v. U.S. Postal Serv.*, 218 F.3d 185, 190 (2d Cir. 2000)).

[7]  *Id.*

[8]  *See* Declaration of Jessica M. Alloway in Support of State of Alaska's Award of Attorney's Fees and Expenses.

[9]  Order re Attorney's Fees, Dkt. 103, at 17.

*Alaska v. United States et al.*                                3:12-cv-00114-SLG
SOA's Supplemental Mem. in Support of Award of Fees and Costs     Page 3 of 13
Case 3:12-cv-00114-SLG   Document 106   Filed 06/07/16   Page 3 of 13

United States when expressly "adopted" by the Bureau of Land Management ("BLM")[10] not only forced the State to file its complaint to quiet title, but it permeated every phase of this litigation.

As the evidence relied on by this Court demonstrates the State's repeated efforts to resolve this dispute without litigation (or early in the litigation) had no potential for success because of the United States' persistence in raising these frivolous arguments.[11] BLM refused to consider any evidence other than commerce, and it limited the type of commerce it would consider only to freighting.[12] With BLM having rejected as insufficient the historical evidence it found relevant, the State was forced to file this lawsuit to quiet title. The United States' reliance on these unsubstantiated arguments continued throughout every phase of this litigation.

---

[10] Order re Attorney's Fees, Dkt. 103, at 18.

[11] *See* Order re Attorney's Fees, Dkt. 103, at 17 (quoting Dkt. 91-2 (Letter to Sen. Murkowski, 2007, from the State Director of BLM)). *See also* Dkt. 91-2, at 3 (Letter to Sen. Murkowski, 2007, from the State Director of BLM ("Since 1983, the State has periodically asked the BLM to reconsider its decision that the upper portion of the Mosquito Fork is not navigable."); Dkt. 91-2, at 2 ("The [Fortymile Mining Association]'s position on navigability appears to generally align with the State's view which liberally applies the 9th Circuit Court's Gulkana River decision to the Fortymile. The Department of Interior Regional Solicitor has advised the BLM that this decision applies only to the Gulkana River and the decision may not be used to determine navigability for other Alaskan Rivers.")). *See also* Dkt. 91-1 (Brown email dated April 26, 2007 ("This is a perennial problem: miners claim that the State owns the riverbed under the 'Gulkana River standard' where BLM has determined it nonnavigable and want long-term camping rights."); Dkt. 91-1 ("I told him that the Gulkana River decision applied to Gulkana River only.").

[12] Once the State received the expert reports, it learned that the United States had further limited what it would consider freighting by requiring a commercial load of at least 2,000lbs.

*Alaska v. United States et al.* 3:12-cv-00114-SLG
SOA's Supplemental Mem. in Support of Award of Fees and Costs Page 4 of 13
Case 3:12-cv-00114-SLG Document 106 Filed 06/07/16 Page 4 of 13

In May 2013, one month after the Court issued its Scheduling and Planning Order,[13] the State propounded its first request for admission and set of interrogatories on the United States.[14] Interrogatory No. 3 asked the United States to provide certain information about trips current and former BLM employees had taken on the Mosquito Fork River, including the identity of the employee, dates of the trip, the trip's purpose, the section of the river traveled, the type of watercraft used, and the approximate weight of material contained in the watercraft.[15] The United States agreed to provide the information subject to a number of objections. One objection being that the requested information was "not relevant . . . and not likely to lead to the discovery of admissible evidence."[16] The United States further reasoned that

> [t]he extent to which BLM employees have traveled on the Mosquito Fork River is largely irrelevant to this case. The BLM's employees have floated the river for various purposes but never for commercial use. Because the test of navigability is that a waterway must be useable for trade and travel, the use of the river by the BLM's employees for administrative purposes has little to no bearing on navigability. Use of the Mosquito Fork by the BLM's employees is only relevant where it can be shown the craft they used are similar to those in use for trade and travel at the time of statehood. The United States takes no position at this time on whether the craft used by the BLM's employees meets this standard.[17]

---

[13] *See* Dkt. 38 (Scheduling and Planning Order).

[14] *See* Dkt. 91-9.

[15] Dkt. 91-9, at 9.

[16] Dkt. 91-9, at 9.

[17] Dkt. 91-9, at 9.

*Alaska v. United States et al.*     3:12-cv-00114-SLG
SOA's Supplemental Mem. in Support of Award of Fees and Costs     Page 5 of 13
Case 3:12-cv-00114-SLG   Document 106   Filed 06/07/16   Page 5 of 13

Over the next year, the parties continued to engage in discovery, including responding to multiple requests for production.

Forced by the United States to litigate whether previous Supreme Court and Ninth Circuit's decisions applied to the Mosquito Fork, and ultimately whether the river was navigable under the applicable standards, the State had a right and an obligation to engage in full and complete discovery to prepare its case. All of the fees and expenses requested by the State are fairly traceable to that effort.

The Alaska Department of Natural Resources ("DNR"), the agency primarily responsible for asserting the State's interest to its submerged lands, conducted fieldwork to determine how often a user can travel on the Mosquito Fork in watercraft carrying a certain load with varying depth requirements. DNR contracted with multiple expert witnesses to assist in this effort. DNR requested the assistance of a historian within its Office of History and Archeology to address historical use on the river as well as provide an opinion on what could be considered a customary and traditional watercraft. Hydrologists within DNR assisted in the fieldwork and analysis; they prepared a flow duration curve as a way of determining how often certain flows in the river are met or exceeded during the open water season.

DNR retained outside experts, Drs. Whittaker and Shelby, to address the "boatability" of the Mosquito Fork. "Boatability" refers to how often a user can travel on the Mosquito Fork River in watercraft carrying a certain load with varying depth requirements. In doing so, these experts also provided an opinion on whether modern

*Alaska v. United States et al.*  3:12-cv-00114-SLG
SOA's Supplemental Mem. in Support of Award of Fees and Costs   Page 6 of 13
Case 3:12-cv-00114-SLG   Document 106   Filed 06/07/16   Page 6 of 13

watercraft used on the Mosquito Fork are materially similar to watercraft that were customarily and traditionally used pre-statehood.

The State also contracted with outside expert Jon Fuller. Mr. Fuller is a geomorphologist and he was retained to provide an opinion on whether the Mosquito Fork was in its natural and ordinary condition as well as offer rebuttal testimony to the United States' retained hydrologist. Whether the Mosquito Fork remained in its natural and ordinary condition was important as it impacted the relevance of the river's post-statehood use.[18]

Dave Seaman was retained by the State to provide engineered drawings of a wooden poling boat located near the Mosquito Fork River outside Chicken, Alaska. Although the State did not list Mr. Seaman as a testifying expert, the United States' hydrologist used and relied on Mr. Seaman's drawings in forming his opinion.[19]

As with the expert fees, the attorney's fees requested by the State are all fairly traceable to the State's effort to prove the river's navigability under the applicable standards as articulated by the relevant Supreme Court and Ninth Circuit decisions.

---

[18] *See PPL Montana v. Montana*, 132 S.Ct. 1215, 1228 (2012) (a navigable-in-fact river is a river that was used, or was susceptible of being used in its natural and ordinary condition as a highway of commerce over which trade and travel could be conducted in the customary modes of trade and travel on water).

[19] *See* Dkt. 65-5, at 4–7.

*Alaska v. United States et al.*     3:12-cv-00114-SLG
SOA's Supplemental Mem. in Support of Award of Fees and Costs     Page 7 of 13
Case 3:12-cv-00114-SLG   Document 106   Filed 06/07/16   Page 7 of 13

### 2. The State's request to recover fees and expenses over the entire course of the litigation is reasonable.

The Court may award attorney's fees for the entire action if the United States' defense in response to the action was offered in bad faith.[20] As discussed above, the United States' bad faith caused the State to bring this action, and the United States maintained its frivolous position throughout the course of the litigation. But not until the close of discovery—after the State received the United States' expert reports and had an opportunity to depose those experts—did the State receive notice of the extent of the United States' unreasonable position. Only then did the State know that there were no genuine issues of material fact, or that even under the United States' indefensible standards, the State could prove the navigability of this river. The State had no opportunity to end this litigation at an earlier stage and avoid the fees and expenses that it incurred.

In *United States v. 87 Skyline Terrance*, the Internal Revenue Service ("IRS") initiated forfeiture proceedings against properties owned by appellants.[21] In May 1989, appellants learned that the IRS failed to obtain the Treasure Secretary's authorization as required prior to beginning the proceedings.[22] Almost two years later, appellants filed a

---

[20] *Kerin*, 218 F.3d at 195–96 ("[If the] district court specifically finds on remand that the USPS's decision to defend this action in the first place was in bad faith, then it may rely on any conduct that is sufficiently related to the underlying litigation in awarding attorney's fees for the entire action.").

[21] 26 F.3d 923, 925 (9th Cir. 1994)

[22] *Id.* at 926.

*Alaska v. United States et al.*                                                          3:12-cv-00114-SLG
SOA's Supplemental Mem. in Support of Award of Fees and Costs      Page 8 of 13
Case 3:12-cv-00114-SLG    Document 106    Filed 06/07/16    Page 8 of 13

motion to dismiss for lack of subject matter jurisdiction.[23] After the district court dismissed the case, they requested attorney's fees under Rule 11.[24] The district court granted the Rule 11 motion, but limited the amount of attorney's fees to two months, the point at which it concluded that appellants should have discovered the court lacked jurisdiction.[25]

The State had no comparable opportunity to end this litigation early. Although the State had notice of BLM's pre-litigation position on the Gulkana decision, the State had no way of knowing the extent to which the United States would pursue this position or whether there were other, legitimate defenses the United States intended to raise. This is demonstrated by the United States' responses to the State's discovery requests.

In June 2014, the State served its second set of interrogatories.[26] Interrogatory No. 5 asks the United States to "[d]escribe any obstacles to commercial navigation of which the United States is aware that exist or have existed on the disputed segment of the Mosquito Fork."[27] The United States objected and declined to provide a response at that time.[28] It reasoned that this interrogatory was "premature at this stage of the litigation

---

[23] *Id.*

[24] *Id.*

[25] *Id.*

[26] Exhibit 1 (United States Responses and Objections to State of Alaska's Second Set of Interrogatories ("Responses to Second Set of Interrogatories")). Because the United States recites the State's request verbatim in its response, the State attaches the response rather than the response and the request as an exhibit.

[27] Exhibit 1, at 6 (Responses to Second Set of Interrogatories).

[28] Exhibit 1, at 6–7 (Responses to Second Set of Interrogatories).

*Alaska v. United States et al.* 3:12-cv-00114-SLG
SOA's Supplemental Mem. in Support of Award of Fees and Costs Page 9 of 13
Case 3:12-cv-00114-SLG   Document 106   Filed 06/07/16   Page 9 of 13

because it 'asks for an opinion or contention that relates to fact or application of law to fact.'"[29] It stated further that:

> [t]his interrogatory seeks the United States' contention regarding the question of the navigability of the disputed segment of the Mosquito Fork. Discovery is not scheduled to close until March 2, 2015, *see* ECF No. 46 ¶ 5, and the United States is continuing its field work and investigation. Moreover, the United States objects to this interrogatory pursuant to Fed. R. Civ. P. 26(b)(4) as seeking the disclosure of privileged materials protected from discovery and prematurely seeking the disclosure of expert opinions, which disclosures are not due until November 14, 2014, *see* ECF No. 46 ¶ 2. Once the United States' experts have completed their investigations and submitted their reports, the United States will supplement its response to this interrogatory.[30]

Until discovery was complete, the State had no way of knowing that the United States' expert historian would opine that the only relevant type of use on a river for navigability purposes is commercial freighting. Nor did the State have any way of knowing that the United States' primary defense would be its argument that personal use is not evidence of navigability or that the United States was not bound by a previous decision of the Ninth Circuit. Only after the State received the United States' expert reports and took their depositions did the State have a complete understanding of the United States' defense, the extent to which the parties agreed on relevant facts, and the ability of the State to argue the navigability of the river even if the Court applied the standards adopted by the United States.

---

[29] Exhibit 1, at 6 (Responses to Second Set of Interrogatories (quoting Fed. R. Civ. P. 33(a)(2)).

[30] Exhibit 1, at 6–7 (Responses to Second Set of Interrogatories).

*Alaska v. United States et al.* 3:12-cv-00114-SLG
SOA's Supplemental Mem. in Support of Award of Fees and Costs Page 10 of 13
Case 3:12-cv-00114-SLG Document 106 Filed 06/07/16 Page 10 of 13

Moreover, unlike in *87 Skyline Terrance*, this litigation (and the United States' bad faith) did not end because of an affirmative action taken by the State. As this Court is aware, the United States maintained its frivolous position throughout the entirety of this case, opposing the State's motion for summary judgment by contesting both the State's interpretation of the law as well as the State's position that there were no genuine issues of material fact. This litigation ended because the United States disclaimed its interest, which it could have done at any time after the State's complaint was filed. Indeed, the United States had an affirmative duty to conduct a reasonable inquiry into the facts and law before filing its answer or any other pleading during the course of this litigation.[31] Instead, the United States continued to deliberately ignore the law and only disclaimed its interest after three years of litigation, multiple field trips by both parties, extensive expert analysis, depositions, and a full round of summary judgment briefing.

---

[31] Fed. R. Civ. P. 11; *Business Guides, Inc. v. Chormatic Commc'n Enters., Inc.*, 498 U.S. 533, 551 (Rule 11 "imposes on any party who signs a pleading, motion, or other paper . . . an affirmative duty to conduct a reasonable inquiry into the facts and the law before filing, and that the applicable standard is one of reasonableness under the circumstances"); *see also* 28 U.S.C. § 1927 ("An attorney or other person admitted to conduct cases in any court of the United States . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorney's fees reasonably incurred because of such conduct."); *Kapco Mfg. Co. v. C & O Emters. Inc.*, 886 F.2d 1485, 1491 (7th Cir. 1989) (imposing sanctions when an attorney "pursue[d] a path that a reasonably careful attorney would have known, after appropriate inquiry, to be unsound"); *Dahnke v. Teamsters Local 695*, 906 F.2d 1192, 1201 n.6 (7th Cir. 1990) (imposing a "continuing duty upon attorneys to dismiss claims that are no longer viable"). *See also* Fed. R. Civ. P. 1 ("[These rules] should be construed and administered to secure the just, speedy, and inexpensive determination of every action and proceeding.").

*Alaska v. United States et al.* 3:12-cv-00114-SLG
SOA's Supplemental Mem. in Support of Award of Fees and Costs  Page 11 of 13
Case 3:12-cv-00114-SLG   Document 106   Filed 06/07/16   Page 11 of 13

By filing its disclaimer, the United States avoided a ruling on the merits. As it argued in its opposition to the State's motion for an award of fees, the disclaimer was "not an adjudication, determination, or concession of the merits of [the State's] claims."[32] Barring this Court's order on the State's request for attorney's fees, the State, and this Court, have no reason to believe that the United States would have ceased to assert these frivolous positions in claiming ownership of the State's submerged lands.

## CONCLUSION

Every phase of this litigation was inextricably intertwined with the issues caused by the United States' bad faith. This litigation was not prolonged by the State, nor did the State have an opportunity to end it earlier. The State is therefore entitled to all reasonable fees and expenses incurred over the entirety of the litigation. The State is entitled to costs in the amount of $10,712.76, and an award of attorney's fees and expenses in the amount of $989,742.16. The costs and reasonable fees and expenses incurred by the State during the course of this litigation are detailed in the Declarations of Jessica M. Alloway, submitted herewith.

DATED June 7, 2016.

        CRAIG W. RICHARDS
        ATTORNEY GENERAL

        By: /s/ Jessica Moats Alloway
            Jessica Moats Alloway
            Alaska Bar No. 1205045
            Michael S. Schechter

---

[32] U.S. Response in Opp'n to State's Mot. for Award of Attorney's fees and Determination of Prevailing Party for Purposes of Costs, Dkt. 98, at 19.

*Alaska v. United States et al.*     3:12-cv-00114-SLG
SOA's Supplemental Mem. in Support of Award of Fees and Costs     Page 12 of 13
Case 3:12-cv-00114-SLG   Document 106   Filed 06/07/16   Page 12 of 13

Alaska Bar No. 1405044
Assistant Attorneys General
Department of Law
1031 W. 4th Avenue, Suite 200
Anchorage, AK 99501
Telephone: (907) 269-5275
Facsimile: (907) 276-3697
Email: jessie.alloway@alaska.gov
      mike.schechter@alaska.gov

Certificate of Service
This is to certify that on June 7, 2016, a copy of the foregoing document will be served electronically via CM/ECF on the following:

Stanley T. Lewis
Dean K. Dunsmore
Rachel K. Roberts
William E. Gerard
Terry Petrie

/s/ Jessica Moats Alloway

*Alaska v. United States et al.*     3:12-cv-00114-SLG
SOA's Supplemental Mem. in Support of Award of Fees and Costs     Page 13 of 13
Case 3:12-cv-00114-SLG   Document 106   Filed 06/07/16   Page 13 of 13